## COMMONWEALTH *vs.* WILFREDO DURAN.

Essex. May 11, 2001. - September 13, 2001.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, New trial, Jury and jurors, Capital case. *Jury and Jurors.*

In a murder case in which the defendant contended that he was denied the effective assistance of counsel, there was no substantial likelihood of a miscarriage of justice created by defense counsel's failure to conduct an investigation, absent circumstances indicating that facts favorable to the defense might have been disclosed by a more complete investigation that likely would have influenced the jury's decision [101-104]; by counsel's failure to impeach eyewitnesses with their prior inconsistent statements, where counsel conducted an effective cross-examination of each witness [104-106]; by counsel's failure to challenge a juror who was a correctional officer at the facility in which the defendant was being detained during the trial where, in the face of good faith on the part of the juror, it was a reasonable tactical decision of counsel not to challenge the juror [106-107]; or by the combined effect of the alleged errors, which were no more prejudicial than any individual errors, which had minimal impact, if any [107].

There was no factual basis on which to allow a motion for a new trial in a criminal case, and no error denying the motion where, although the defendant contended that a juror "made a representation during jury empanelment when he denied knowing the defendant," the judge found that the juror "did not know or recognize the defendant" at the time of empanelment, and that the defendant was "afforded . . . the opportunity to participate fully in the juror selection process" and "did not object to the seating" of the juror. [107-109]

This court, after considering defense counsel's unfulfilled promise that the defendant would testify and tell the jury where he was on the afternoon of the crime and the judge's error in instructions to the jury on malice, declined to exercise its authority under G. L. c. 278, § 33E, to reduce the verdict of guilty of murder in the first degree or to provide other relief. [109-112]

INDICTMENT found and returned in the Superior Court Department on May 31, 1995.

The case was tried before *Robert A. Barton,* J., and a motion for a new trial was heard by him.

*Steven J. Rappaport* for the defendant.

*Gregory I. Massing*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant was convicted of murder in the first degree on a theory of deliberate premeditation. Represented by new counsel on appeal, the defendant argues that he is entitled to a new trial because he was denied the effective assistance of counsel. He also claims misconduct on the part of one juror who, at the time of trial, worked as a correctional officer in the facility where the defendant was housed while awaiting trial. The defendant further appeals from the denial by the trial judge of his motion for a new trial. The two appeals have been consolidated. We affirm the defendant's conviction and decline to exercise our power under G. L. c. 278, § 33E, to reduce the verdict or to provide other relief. We also affirm the denial of the motion for a new trial.

1. *Facts.* We recite the evidence in its light most favorable to the Commonwealth. In brief, the victim was confronted in broad daylight by four men, at least two of whom were armed. He fled; the defendant chased the victim and shot at him.

The shooting occurred on the afternoon of Saturday, May 7, 1994, on and near the grounds of My Sister's Keeper, a residential program in Lawrence for women recovering from substance addictions. The program directors are Luis and Celia Torres, who operate the program from their residence. Each Saturday afternoon women in the program were permitted to receive visitors, including their own children. That afternoon, a number of program participants, several young children, at least one adult visitor, and Luis and Celia Torres were socializing outside the residence. There was conflicting evidence regarding the number gathered, perhaps twenty or more.

At approximately 4 P.M., a light gray automobile pulled up in front of the house, and at least three men jumped out,[1] two brandishing firearms. Celia Torres, who thought the men were

---

[1]Celia Torres claimed that three men from the automobile jumped over the fence and chased the victim across her yard. Luis Torres believed he saw four men jump over the fence and give chase to the victim.

in search of her husband, shouted at him to flee.[2] He immediately ran inside the house. Everyone else remained outside.

The victim, whom the men were actually pursuing, had been standing near the house. He jumped over the front fence of the residence and ran through the yard, with the assailants in pursuit. Celia Torres, who was in the yard at the time, implored the defendant, who was shooting at the victim with a small silver firearm as he ran through the yard, to be careful of the children. As he ran past her, the defendant turned to face her and told her to get the children out of the way. The armed men chased the victim through the yard and into an alley.

Meanwhile, the driver of the gray automobile drove to the next corner, where he waited. The victim, now injured, crawled from the alley onto the nearby street. The men who had pursued him jumped into the waiting automobile and drove away. The victim died moments later, as police and emergency medical personnel arrived to assist him. He had sustained three gunshot wounds, all from the same weapon.

The Commonwealth's evidence that the defendant fired the fatal shots was strong. Three eyewitnesses identified him as the shooter. The first was Celia Torres; she did not previously know the defendant. On the Tuesday following the shooting, the police displayed to her photographs of a number of men, including the defendant. She immediately identified the defendant as the shooter.[3]

Aracelis Pena was the second person to identify the

[2]The evening before the shooting, Celia and Luis Torres were in the residence when they heard a shot outside. On investigation, they saw a gray car driving away, and encountered the victim in this case, who was gesticulating and shouting, "They tried to get me, but they didn't." A burgundy colored automobile then drove by slowly, and a passenger yelled something threatening to the victim. Later that evening, Luis Torres drove the victim to a location where the police had apprehended the occupants of the burgundy colored automobile. The victim did not identify anyone, and the men were not detained. Celia Torres testified that on the afternoon of the murder she assumed that her husband was a target of the gunmen because he had assisted the victim in attempting to identify the assailants the night before.

[3]Celia Torres did not know the defendant previously. On the afternoon of the shooting she told a police officer that the shooter "looked like Torobio," someone she did know. She did not say that the shooter was "Torobio," nor did she tell the police officer that the shooter was someone she knew.

defendant. Pena, a recovering drug addict, was a resident of My Sister's Keeper at the time of the murder. She initially told the police that she did not know and could not identify any of the assailants. On the Tuesday following the shooting, the police showed her a series of photographs. She again said that she was not able to make any identification. Later that same Tuesday, Pena returned to the police station accompanied by Celia Torres. Interviewed separately, Pena this time told the police, and later testified, that she had known the defendant and his brother since high school and had socialized with them on many occasions. She then identified the defendant as the shooter from a photographic array. She testified at trial that both the defendant and his brother had emerged from the gray automobile, and that she had recognized them immediately. The defendant, she said, pursued the victim as he continued shooting at him, while his brother, also armed, hung back.[4] She testified that fear prevented her from initially identifying the defendant; Celia Torres persuaded her that she needed "to do whatever you need to do." She came forward on reflecting that her own child, who was with her at the time, could have been killed by the armed men.

Luis Torres, the third person to identify the defendant, initially told the police that he had not seen anyone closely enough to be able to make any identification. He refused to look at any photographic arrays, when requested by the police. One year later, when he appeared before the grand jury as a witness, he identified the defendant as the shooter from a photograph in evidence. His trial testimony was to like effect.

Two days after the murder, Lawrence police found a gray automobile, identified by witnesses as the one involved in the shooting. The defendant's fingerprints were found on a tape cassette inside the automobile. There was evidence tending to show that the same automobile had been used in the "drive-by" shooting heard by Celia and Luis Torres on the Friday evening before the murder.

The defendant was arrested in New York City in January, 1995, nine months after the shooting. He gave a false name to

---

[4]There was evidence that on the previous night the defendant's brother had sustained a bullet wound in his back.

the New York detective who apprehended him. Later that day he admitted his real identity to the detective, and told the detective that he knew about the incident, but did not know who was responsible for the shooting.

The defense was based on misidentification and an alibi. The defendant called two witnesses, his father and his aunt, who testified that he had been at home with his father watching television at the time of the shooting. On rebuttal, a Lawrence police officer testified that he previously had interviewed both witnesses soon after the shooting. The defendant's father had told him that the defendant was with him at a softball game on the morning of the murder, but he did not know where he was during the afternoon. The defendant's aunt had told the officer that she did not recall seeing him on the day of the shooting.

2. *Ineffective assistance of counsel.* We now consider the defendant's claim that his representation at trial was not constitutionally adequate. Our inquiry generally with respect to claims of ineffective assistance of counsel is "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In reviewing "capital" cases pursuant to G. L. c. 278, § 33E, we apply a standard of review "even more favorable to the defendant." *Commonwealth* v. *MacKenzie, supra.* We consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Under this "broader standard of review" we review a claim "even if the alleged error on the part of trial counsel does not constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.' " *Commonwealth* v. *MacKenzie, supra.* With these principles in mind, we consider each of the points raised by the defendant, and conclude that there is no

substantial likelihood of a miscarriage of justice on these grounds.[5]

a. *Failure to investigate.* Identification was the central issue in the case. The defendant maintains, with considerable support, that his trial counsel initiated absolutely no investigation of the circumstances of the murder.[6] Because trial counsel made no effort to identify, locate, or interview any witnesses who might undermine what he claims was "equivocal" identification testimony by the Commonwealth's witnesses, he argues that he was deprived of an effective defense.

Counsel, of course, has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* v. *Washington*, 466 U.S. 668, 691 (1984). The defendant correctly asserts that there were several witnesses — perhaps twenty or more — to the crime. In addition to the three witnesses called by the Commonwealth, several children were present at the time of the shooting, as well as Pena's then husband, Angel Gonzales, and the Torreses' fourteen year old son. Nevertheless, we are not persuaded that the failure to investigate gives rise to any cognizable claim.

Nothing in the record explains trial counsel's lack of investigation of these witnesses. No affidavit was filed, and the evidentiary hearing on the new trial motion was limited to a

---

[5]The Commonwealth points out that the docket in the Superior Court does not indicate the filing of a notice of appeal, and concludes that the defendant did not file a notice of appeal. There is, on the other hand, other evidence in the record suggesting that a notice of appeal was in fact filed. The Commonwealth invites us to decide the appeal, notwithstanding its contention that the defendant did not file a notice of appeal, in order "to conserve judicial resources."

The Commonwealth contends that in the absence of a notice of appeal we should treat the defendant's claims as not having been properly preserved, and that we should therefore examine his claims only to determine whether there has been a substantial likelihood of a miscarriage of justice. We need not sort out the claimed defects in the docketing of any notice of appeal. Claims of ineffective assistance of counsel in direct appeals from convictions of murder in the first degree are, in any event, measured by the substantial likelihood of a miscarriage of justice standard. *Commonwealth* v. *Plant*, 417 Mass. 704, 715-716 (1994). *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

[6]The record reveals that, on June 16, 1995, trial counsel filed and the judge allowed a motion for funds for an investigator, in the amount of $1,500. These funds were never used.

separate issue. See note 11, *infra*. We do not know, therefore, whether counsel made an affirmative decision not to interview any of these witnesses, or what his reasons actually were.

We do discern from the record that it would not have been unreasonable to decide not to undertake an investigation. Defense counsel knew that Pena's former husband, Gonzales, had been present at the scene, but Pena was unaware of his whereabouts. There is nothing to suggest that counsel would have had any success in locating him, or that Gonzales could or would have contributed to the defense of misidentification. Interviewing the Torreses' son would have been of scant benefit, as he was interviewed by the police and said that he could not identify any of the multiple men carrying guns. None of the other witnesses present was identified, and most appeared to have been very young children. Defense counsel may also have been wary of locating witnesses from whom favorable testimony could not be assured.

While the lack of investigation by defense counsel in a capital case is troublesome, especially where counsel sought and obtained funds, the defendant has failed to suggest with any particularity how any investigation would have benefited his defense; he can identify no information that might have been unearthed by any investigation. Speculation, without more, is not a sufficient basis to establish ineffective representation. See *Commonwealth* v. *Bolduc*, 375 Mass. 530, 540 (1978).

In this case the identification testimony was strong, in particular that of Celia Torres. She was able to observe the defendant's face as he turned to address her. She promptly identified him from a photographic array, and her identification never faltered. While Pena initially told the police she could not identify the shooter, she had a plausible reason — fear — for not doing so. Her trial testimony that she knew the defendant and his brother well,[7] and that she immediately recognized them as the gunmen that Saturday afternoon, is consistent with the

[7]The defendant did attempt to show that Pena was hostile toward him because of an earlier argument in which they were both involved. This would have confirmed to the jury that Pena knew the defendant before the shooting. It was for the jury to decide whether her testimony was biased due to any hostility she might have harbored toward the defendant.

defendant's statement to the New York police that his brother was somehow implicated.[8] In these circumstances, we are not persuaded that facts favorable to the defense might have been disclosed by a more complete investigation that likely would have influenced the jury's decision. See *Commonwealth* v. *Bertrand*, 385 Mass. 356, 365-366 (1982).

b. *Failure to impeach the witnesses with their prior inconsistent statements.* The defendant contends that trial counsel failed to cross-examine effectively the three eyewitnesses with their prior inconsistent statements. There is no merit to this point. Trial counsel, who had significant criminal defense experience,[9] conducted an effective cross-examination of each witness. It is clear that he had carefully reviewed the earlier statements of the witnesses, and had identified key weaknesses in their testimony. He brought to the attention of the jury any inconsistency of significance.

The defendant lists several items included in police reports or the minutes of the grand jury that he suggests were either contradicted by, or omitted from, the trial testimony of the three witnesses. He does not explain how exploiting these inconsistencies work to strengthen the defense case, suggesting only that identifying each and every inconsistency would have been an effective strategy. It is apparent that trial counsel adopted a different strategy: he focused on those inconsistencies that most advanced the defendant's theory of misidentification, ignoring others that are cumulative or could have been viewed as counterproductive.[10] We cannot say that it was ineffective for counsel to do so. See *Commonwealth* v. *Sylvester*, 35 Mass.

---

[8]A New York police officer testified that the defendant told him that the defendant "knew about the shooting," and that "the day before the shooting himself, his brother and some friends were in the area," and the "beef was all over some kind of money."

[9]At the time of the trial defense counsel had practiced as a criminal defense attorney for some forty years and had acted as defense counsel in numerous capital cases; at the time of the hearing on the motion for a new trial (three years after the trial) he had acted as defense counsel in thirty-six capital cases.

[10]For example, counsel challenged Celia Torres with her statement that the man who shot the victim looked like another man from the neighborhood, Torobio. He established that Luis Torres initially told the police that he did not get a look at the gunman, and solicited from Torres an admission that he had lied to the police. Counsel impeached Pena with her testimony to the

App. Ct. 906, 907 (1993) ("It does not constitute ineffective as-
sistance of counsel that he did not probe every inconsistency
which occurs to appellate counsel when she, at comparative
leisure, prowls through the record").

The defendant is particularly critical of defense counsel's
cross-examination of Pena because he failed to impeach her
with former and pending criminal charges against her. At the
time of trial, Pena faced criminal charges of larceny and welfare
fraud, charges of which the jury were never made aware. The
defendant asserts that these charges were later resolved in a
"very favorable disposition" to Pena, implying that she was
promised leniency in exchange for her testimony. There is no
evidence that the Commonwealth made any such promises to
Pena. The record suggests that, in any event, any purported
promises were not the reason for her compelling testimony
against the defendant. She identified the defendant as the shooter
in May, 1994; the criminal charges against her were not brought
until July, 1996. Had defense counsel proceeded down the path
the defendant now suggests, the Commonwealth's response
might have been devastating, undermining any hint of bias on
Pena's part that defense counsel had in fact established. See
note 7, *supra.* In fact, defense counsel did cross-examine Pena
about any arrangement she had with the Commonwealth, and
Pena denied that the police were helping her in exchange for
information. Defense counsel's inquiry was calculated to "raise
the issue of possible bias sufficiently to lodge it in the minds of
the jury but not to pursue it so far that it became apparent that
it was a false attack," *Commonwealth* v. *Daigle*, 379 Mass. 541,
546 (1980).

Nor was counsel ineffective in failing to impeach Pena with
her earlier criminal convictions. "In general, failure to impeach
a witness does not prejudice the defendant or constitute ineffec-
tive assistance." *Commonwealth* v. *Bart B.*, 424 Mass 911, 916
(1997). Trial counsel appears to have calculated, quite reason-
ably, that her convictions for relatively minor larceny charges
would not have undermined Pena's credibility. She fainted dur-
ing her testimony, and the jury may have felt sympathy toward

grand jury that the defendant stayed behind and talked to the driver of the
gray automobile while another man chased and shot the victim.

her. The jurors were made aware that Pena was a rape victim, that she resided in a program for recovering drug abusers, that she had something of a troubled past. Defense counsel walked a fine line between impeaching her effectively, and not treating her too harshly. We cannot say that counsel's failure to attempt to use every conceivable method to impeach Pena was manifestly unreasonable. "Legal contentions, like the currency, depreciate through over-issue." *Commonwealth* v. *Sowell*, 34 Mass. App. Ct. 229, 233 (1993), quoting *Jones* v. *Barnes*, 463 U.S. 745, 751-752 (1983).

c. *Failure to use peremptory challenges.* The defendant contends that it was ineffective representation when his trial counsel did not challenge a juror who was a correction officer at the Essex County house of correction at Middleton (Middleton) where the defendant was being housed during the trial. The record does not support his claim.

The judge empanelled sixteen jurors from a venire of twenty-six. The defendant was granted sixteen peremptory challenges; four were exercised, although the record does not indicate whether by defense or prosecution. The judge, identifying the defendant by name, of course, asked the jurors whether any among them knew any parties in the case. The defendant was also present while the colloquies were conducted. There were no affirmative responses, including from juror 5-5, the correctional officer who was later empanelled.

Two days after empanelment, the prosecutor brought to the judge's attention that juror 5-5 may have had contact with or may have known the defendant through his employment at Middleton. The prosecutor asked that the juror be brought to sidebar so the judge could inquire whether he knew the defendant. The judge responded that there had been no challenge to this juror, and he refused to question the juror further. The prosecutor then asked the judge to ensure that juror 5-5 would not work at Middleton during the pendency of the trial and thereby foreclose any possibility that the juror would encounter the defendant. Defense counsel told the judge this would be "satisfactory" to him. The judge ordered the juror not to report to work until the trial ended, and notice of the order was dispatched to the correction facility. The judge's actions were entirely appropriate.

The fact that the juror was a correctional officer did not disqualify him from jury service, nor did it create any presumption of bias. See *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 460-461 (1989) (juror's employment as police officer, "in the absence of a showing of prejudice or partiality," insufficient to sustain challenge for cause). Counsel was not ineffective simply because he did not exercise a peremptory challenge to remove the officer. *Commonwealth* v. *Mello*, 420 Mass. 375, 396 (1995) (counsel not ineffective for failing to strike jurors with relatives in law enforcement). Moreover, the record indicates that it was the juror himself who brought to the court's attention that he worked at the correctional facility where he thought the defendant might be housed because, on leaving the court, he saw a Middleton van in the court parking lot. This suggests that the juror handled the situation with candor, taking precaution to ensure that the defendant would not be prejudiced by his presence on the jury. In the face of this demonstration of good faith on the part of the juror, it was a reasonable tactical decision of experienced defense counsel not to challenge the juror.

d. *Cumulative error and the ineffective assistance claim.* The defendant argues that, even if none of the specific errors requires that he be granted a new trial, the combined effect of the mistakes was so prejudicial as to create a substantial likelihood of a miscarriage of justice. The cumulative errors, such as there may have been, were no more prejudicial than any individual errors, which had minimal impact, if any. See *Commonwealth* v. *Fuller*, 421 Mass. 400, 410-413 (1995); *Commonwealth* v. *Garcia*, 379 Mass. 422, 441-442 (1980).

3. *Motion for a new trial.* In his motion for a new trial, and on appeal from the denial of that motion, the defendant claimed that juror 5-5 "made a misrepresentation during jury empanelment when he denied knowing the defendant." The defendant asserts that he is entitled to a new trial if he successfully has "shown that 'a juror was actually biased because the juror dishonestly answered a material question on voir dire and that prejudice resulted from the dishonesty.' " *Commonwealth* v. *Rice*, 427 Mass. 203, 207 (1998), quoting *Commonwealth* v. *Amirault*, 399 Mass. 617, 625 (1987). The defendant has failed to make the necessary showing.

On May 19, 1999, the judge held an evidentiary hearing, the scope of which was "limited to the issue of juror misconduct."[11] The defendant testified that, approximately four months before trial, juror 5-5 was involved in subduing the defendant during an altercation at Middleton. The defendant asserted that juror 5-5 must surely have remembered him from that incident, and was therefore untruthful when he claimed not to know him. The defendant also claimed that juror 5-5 "made a misrepresentation" when he testified at the evidentiary hearing that he did not remember working any shift in the segregation unit during March or April of 1996, when the defendant was held there. There was evidence that the log for April 1, 1996, confirmed that juror 5-5 had worked in the segregation unit that day.

At the evidentiary hearing, the defendant and three inmates who had been incarcerated at Middleton with the defendant, all testified that the juror had participated in subduing the earlier altercation involving the defendant. The Commonwealth presented evidence that, on the day of the altercation, the juror was not at work. The judge found that juror 5-5 was not in fact working on the day in question, and could not have had any involvement in subduing the defendant that day. The judge further said that he did "not credit the testimony of these inmates."[12] The credibility of these witnesses was a preliminary matter for the judge and his decision on that matter is final. See *Commonwealth* v. *Bertrand*, 385 Mass. 356, 364-365 (1982). The judge found that juror 5-5 "did not know or recognize the defendant" at the time of empanelment, and that the defendant was "afforded . . . the opportunity to participate fully in the juror selection process" and "did not object to the seating" of juror 5-5. In these circumstances, there was no factual basis on which to allow the motion for a new trial, and no error in deny-

---

[11]While the evidentiary hearing on the defendant's motion for a new trial was limited to juror misconduct, the defendant raised in his motion the issue of ineffective assistance of counsel. For the reasons already stated Part 2, *supra*, we conclude that the judge did not err in concluding that the defendant "presented no credible evidence to establish ineffective assistance of counsel."

[12]Of the three inmates who testified on the defendant's behalf, one ultimately admitted that it was the defendant who told him that Juror A had been involved in the altercation. The other two could not identify Juror A, who was in the court room the day of the hearing.

ing the motion. See *Commonwealth* v. *Amirault*, 399 Mass. 617, 625-626 (1987).

4. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E. We consider two issues not briefed by the parties that require discussion.

First, during his opening statement the defendant's trial counsel promised the jurors that the defendant would testify and tell the jury where he was on the afternoon of the murder.[13] He began by telling the jury that "there are two sides to every story," and then said: "[W]hat you are going to hear from the defendant's side of the story is that [the defendant], this young man sitting here, was not, was not at that area on May the 7th, 1994, at approximately 4 P.M. in the afternoon. He is going to take the stand and he is going to tell you in his own words where he was, who was with him." But after promising the jury that they could look forward to hearing the defendant's exculpatory version of events, the defendant never testified.

A promise by defense counsel in his opening statement to produce key testimony, followed by a failure to deliver it may, without more, constitute ineffective assistance of counsel. See, e.g., *Anderson* v. *Butler* 858 F.2d 16, 19 (1st Cir. 1988) ("to promise even a condensed recital of such powerful evidence, and then not produce it" is "prejudicial as a matter of law"). If counsel fails to deliver on a promise that the defendant *will* testify, a danger arises that the jury may presume that the defendant is unwilling to testify under the pressure of cross-examination under oath, or that the defense is otherwise flawed. Defense counsel's dramatic opening argument here causes us to pause and consider the possibility of the damaging effect it may have had on the defendant's case.

We first reject any suggestion that trial counsel's failure to produce evidence to which counsel alludes in an opening statement constitutes, in and of itself, ineffective assistance of counsel in all cases. See, e.g., *Turner* v. *Williams*, 35 F.3d 872 (4th Cir.), cert. denied, 514 U.S. 1017 (1994) (not ineffective to fail to present promised evidence if decision motivated by tactical considerations), overruled on other grounds, by *O'Dell* v.

---

[13]This point was not addressed in the defendant's brief, but was raised by defense counsel at oral argument.

*Netherland,* 95 F.3d 1214 (4th Cir. 1996), aff'd, 521 U.S. 151 (1997). See also *Commonwealth* v. *Nardone,* 406 Mass. 123, 127 (1989) (defense counsel's "failure to call a ballistics expert, as promised, was clearly a decision forced upon him by events over which he had no control," and thus not per se ineffective assistance). Cf. *Anderson* v. *Butler, supra.* Rather, in each case the defendant must demonstrate that counsel's unfulfilled promise gives rise to a substantial likelihood of a miscarriage of justice.[14] That determination will depend on such factors as the nature and extent of the promise made in the opening statement, any strategic justifications for the subsequent decision not to produce the evidence, and the likely impact on the jury of the failure to produce the promised evidence.

There is nothing in the record to explain why the promise was made in the first place or why the defendant did not testify.[15] The defendant has offered but a simple assertion that defense counsel's opening statement that the defendant would testify constituted ineffective representation. We do not know why defense counsel initially believed (if he did) that the defendant would testify, nor do we know why that strategy, if it was a strategy, changed. See *Anderson* v. *Butler, supra* at 22 (Breyer, J., dissenting) ("I do not see how the majority can deduce prejudice, or professionally unreasonable strategic decision-making, from such a scanty record . . . particularly when the parties have not briefed the reasons for the initial reference to the witnesses"). We would need an explanation by counsel. This issue could have been, but was not, raised in the defendant's motion for a new trial.

Viewing the record as a whole, and considering the strength of the Commonwealth's case, we cannot say that the defendant

[14]In a noncapital case, the defendant would have to demonstrate that defense counsel's failure to produce important evidence promised in opening statements was "behavior . . . falling measurably below that which might be expected from an ordinary fallible lawyer," and deprived the defendant "of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).

[15]After the Commonwealth rested defense counsel informed the judge that "we indicated the other day . . . *there was a possibility* that the defendant might testify or might not" (emphasis added). Counsel continued, "I met with him yesterday," and "he has indicated to me that he is choosing to exercise his right not to testify."

has demonstrated that counsel's actions gave rise to a substantial likelihood of a miscarriage of justice. The prosecutor did not comment on the defendant's decision not to testify, nor did the Commonwealth otherwise attempt to profit from defense counsel's opening promise. Defense counsel did not abandon the defendant's alibi defense; he called two witnesses, the defendant's father and aunt, both of whom testified that the defendant was at home at the time of the murder. Finally, the judge gave clear instructions on the point to the jury, admonishing them that "[n]o inference unfavorable to the defendant can be drawn by [them] by reason of his not testifying."

The second issue, not raised or briefed by either of the parties, concerns an error in the judge's instructions on malice. The jury were instructed that they could find the defendant guilty of murder in the first degree on a theory of deliberate premeditation only. Nevertheless, on the element of malice, the judge instructed the jury on the first and second prongs of malice. We have clarified that "it is better to make clear to the jury that 'murder in the first degree by reason of deliberate premeditation relates only to the first prong of malice.' " *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998), quoting *Commonwealth* v. *Diaz*, 426 Mass. 548, 553 (1998). "Where [as here] only deliberate premeditation is offered to the jury as a basis for murder in the first degree, the inclusion of instructions on second . . . prong [of] malice, even if justified for other reasons,[16] could be confusing without the limiting instruction that only first prong malice supports a deliberate premeditation conviction." *Id.* We have reviewed this error to determine whether it caused a substantial likelihood of a miscarriage of justice and are satisfied that it did not. The judge gave a correct and clear instruction on the element of deliberate premeditation. He told the jury that the Commonwealth must prove beyond a reasonable doubt[17] that there was "[f]irst the deliberation and premeditation; then

---

[16]As noted in *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 n.3 (1998), an instruction on all three prongs of malice is "justified by the fact that the jury were also charged, as it would be in every murder case, on murder in the second degree." *Id.*, citing *Commonwealth* v. *Sires*, 413 Mass. 292, 296-297 (1992).

[17]The judge's admonition that this had to be proved beyond a reasonable doubt occurred at the beginning of the instruction, several sentences before.

the decision *to kill*; and lastly, the *killing* in furtherance of the decision" (emphasis added). In these circumstances, "a reasonable juror could only have understood that a guilty verdict . . . by reason of deliberate premeditation required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill." *Id.*, quoting *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997). Moreover a jury's finding to that effect was fully supported by the evidence: the defendant chased the victim, while aiming and firing a gun directly at him. The victim died from the gunshot wounds. See *Commonwealth* v. *Robertson*, 408 Mass. 747, 757 (1990).

Having disposed of those two issues, we see no reason to exercise our authority to reduce the jury's verdict or to order a new trial. As the judge noted before he imposed the sentence, the victim, "whatever the reason, was hunted down just as dogs would hunt down a deer. It truly was an evil act." The defendant was entitled to a fair trial, not a perfect one. *Commonwealth* v. *Lodge*, 431 Mass. 461, 476 (2000). The defendant received a fair trial. The jury's verdict is consistent with the evidence. There was no ineffective assistance of counsel.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*