COMMONWEALTH vs. MICHAEL McMAHON.

Middlesex. November 5, 2004. - February 11, 2005.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Argument by prosecutor, New trial, Assistance of counsel, Defendant's competency, Capital case. *Malice. Constitutional Law,* Assistance of counsel. *Evidence,* Competency.

Evidence presented at a murder trial sufficed to establish that the defendant acted with deliberate premeditation. [417-418]

At the trial of an indictment charging murder in the first degree based on a theory of deliberate premeditation, the judge's erroneous instructions, which defined malice with reference to all three prongs of malice, did not give rise to a substantial likelihood of a miscarriage of justice, where the instructions included a correct charge on deliberate premeditation. [418]

At a murder trial, certain statements in the prosecutor's closing argument, when combined with the judge's instructions on the burden of proof and the defendant's election not to testify, did not constitute improper comment on the defendant's decision not to take the stand, and certain other comments in the prosecutor's closing argument did not misstate the evidence. [418-421]

A Superior Court judge, after an evidentiary hearing on a criminal defendant's motion for a new trial, in which the defendant contended that, at the time he made his decision not to testify, he had become incompetent to stand trial, did not err in his assessment that, despite the fact that the defendant had an emotional outburst outside the court room on one day during trial, the defendant was nevertheless competent when he made his decision [421-424]; further, the defendant failed to demonstrate that his counsel rendered ineffective assistance with respect to the issue of the defendant's competency [424-425] or by announcing to the jury in his opening statement that the defendant would testify, which was a strategic decision that had failed through no fault of counsel [425-426].

No reason appeared on the record of a murder trial for this court to exercise its power under G. L. c. 278, § 33E, either to reduce the verdict or to order a new trial. [426-427]

INDICTMENT found and returned in the Superior Court Department on June 20, 1994.

The case was tried before *Robert A. Barton,* J., and a motion for a new trial, filed on March 25, 1997, was heard by him.

*Stephen Paul Maidman* for the defendant.

*Thomas D. Ralph*, Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree for the shooting death of James Pierce. His motion for a new trial, alleging that he had been incompetent to stand trial and had been denied the effective assistance of counsel, was denied after an evidentiary hearing. His appeal from the denial of that motion was consolidated with his direct appeal. On appeal, the defendant contends that (1) the evidence was insufficient to establish deliberate premeditation (the only theory of murder in the first degree submitted to the jury); (2) the judge's instructions erroneously defined malice; (3) the prosecutor's closing argument misstated the evidence and improperly commented on the defendant's decision not to testify; (4) his motion for a new trial should have been allowed, as he had become incompetent to stand trial by the time he had to decide whether to testify; and (5) his attorney rendered ineffective assistance with respect to the defendant's claimed lack of competency and his decision not to testify, and with respect to his opening statement (during which counsel told the jury that the defendant would testify to a version of the killing that inculpated the Commonwealth's immunized witness). He also asks that we exercise our authority under G. L. c. 278, § 33E, to grant a new trial. For the following reasons, we affirm the conviction, affirm the order denying the defendant's motion for a new trial, and decline to grant relief under G. L. c. 278, § 33E.

1. *Facts.* a. *Evidence at trial.* We summarize the trial evidence in the light most favorable to the Commonwealth. The victim, James Pierce, was a regular customer at a bar in Malden known as the R & R Lounge (R & R), owned by the family of Dennis Trodden. Pierce and Trodden had been friends for many years, and Trodden was godfather to Pierce's daughter. The defendant also frequented the R & R, and spent time there with both Pierce and Trodden. On September 14, 1993, Pierce engaged in a brief "beer brawl" with another customer, Dennis Alera, resulting in Pierce being cut on the face and Alera being ejected from the bar. Such altercations were not uncommon at the R & R, but had never resulted in any legal trouble for the bar or

the Trodden family. Concerned about medical bills and possible scarring on his face, Pierce filed a criminal complaint against Alera in the wake of the September 14 incident. Alera, who worked as a fire fighter, wanted the charges dropped. Members of the Trodden family, who worked at the bar and knew both men, were encouraging Pierce to settle his dispute with Alera, and Pierce ultimately told Dennis Trodden that he would do so.

On October 4, 1993, the defendant and Dennis Trodden spent the evening drinking at the R & R, then went across the street to the Kohala Restaurant. Pierce was also at the R & R that night. At around midnight, Pierce went over to the Kohala Restaurant, where he spoke briefly with the defendant outside of Trodden's hearing, and then returned to the R & R. At closing time, around 1:30 A.M., Pierce left the bar and drove off in his own vehicle heading in the direction of his home in Everett. The Kohala Restaurant was also closing, and the defendant and Trodden came out, got into the defendant's vehicle, and began driving in the opposite direction, headed toward the defendant's home to continue drinking. They encountered Pierce's vehicle, and the defendant honked his horn, stopped, and invited Pierce to join them. Pierce turned his vehicle around and followed them to the defendant's house a short distance away.

When the three were inside the defendant's home, the defendant provided them with beer and requested that they go out on the porch, as they were being too noisy in the house (where the defendant's wife was trying to sleep). Trodden and Pierce went out, while the defendant went into his bedroom and then joined them outside.[1] The defendant, again protesting that they were being too loud, recommended that they cut through a fence in back and walk along the railroad tracks to an all-night gasoline station where they could buy cigarettes. They followed his suggestion, and the three went along the tracks, with Trodden walking slightly ahead of Pierce (who, due to a limp, walked more slowly). The defendant stopped and bent over, as if to tie his shoes, while the other two proceeded on ahead.

---

[1] Although the defendant was known to carry a weapon on his person, he had not been seen with any gun earlier that night. The Commonwealth's theory was that he retrieved a gun from the bedroom before going outside.

Trodden suddenly heard a loud bang, covered his ears, and turned around. He saw Pierce lying face down beside the tracks. The defendant stood over Pierce, gun in hand. He leaned over, put the gun to the back of Pierce's head, and shot him again. The defendant ordered Trodden to come over and to help him drag Pierce's body into the bushes along the tracks. Trodden asked the defendant why he had killed Pierce. The defendant replied, "Fuck him. I never liked him anyways." After hiding the body, the two returned to the defendant's house, where the defendant retrieved a pair of gloves. He explained to Trodden that he did not want to leave the body by the tracks. The defendant and Trodden retrieved Pierce's car and drove it down the tracks to the point where the body was hidden. They dragged the body out from the bushes, whereupon the defendant ordered Trodden to help him load the body into the back of the car and cover it with blankets. The defendant then drove the car, ordering Trodden (whose hands were bare) to avoid touching the door handle on the passenger side. The defendant drove to a parking lot, dropped the keys on the floor of the car, and abandoned the vehicle. He and Trodden ran back to the defendant's house. As they entered, the defendant's wife came out of the bedroom and, seeing their bloodstained and muddy clothes, asked them what was happening. The defendant replied, "I got rid of him. He's gone." The defendant fetched clean clothes for both himself and Trodden, whereupon they showered and changed. The defendant placed the bloody clothes in a trash bag. The two spent the rest of the night drinking, and then telephoned a friend for a ride to another bar the next morning. The defendant told Trodden that, if the police questioned him, he was to say that he had last seen Pierce at the restaurant the night before, and that he (Trodden) had gone home with the defendant where the two had spent an uneventful night.

The police discovered Pierce's body the next day, and inquiries as to where he had last been seen led them to the R & R. They questioned Trodden, who answered as the defendant had instructed him. Periodically thereafter, the defendant would check with Trodden to confirm that he (Trodden) was not giving any information to the police. Trodden assured the defendant that he was sticking to the version that the defendant had outlined.

The police also questioned the defendant, who gave them the same version as Trodden. The defendant, however, elaborated on his answers, telling the police that the victim had had "a problem" some months earlier with a man named Edward Williams, who was known to carry a gun. Professing a desire to help the police, the defendant asked for a pager number for one of the officers so he could notify him immediately if he picked up any further information at the bar. The next day, the defendant contacted the officer, and told him that he suspected that Dennis Alera might have been involved. He also told them that he was bothered by the attitude of members of the Trodden family, who seemed unconcerned about the murder but were instead concerned that the attention drawn by the investigation was hurting their "bookmaking business" at the R & R.

The police looked into the various leads that the defendant provided them, but found that Alera had not been in the area at the time of the murder, and uncovered nothing to implicate the Troddens (or anyone else). As of December, 1993, the investigation was at a standstill. At that time, the police had neither evidence nor suspicion that the defendant or Trodden had been involved, but knew that Trodden, Trodden's brother, and the defendant were among the last people to see Pierce alive at the bar and restaurant the night before his body was discovered. In order to preserve their testimony, the three were subpoenaed to testify before the grand jury. The defendant appeared particularly eager to testify and, on December 22, testified to the same information he had originally given the police. He denied any knowledge of who had committed the murder, and denied any involvement in the killing.[2] Trodden's brother testified next, relating how he had seen the victim at the R & R that night and had seen him depart the area in his own vehicle after the bar closed.

When the assistant district attorney emerged from the grand jury room telling Trodden that it was his turn to testify, Trod-

---

[2]The defendant moved to suppress his grand jury testimony on various grounds. After an evidentiary hearing, that motion was denied, and the defendant claims no error on appeal with respect to the denial of that motion. Pursuant to G. L. c. 278, § 33E, we have reviewed the evidence offered on the suppression.motion, and we see no error in the denial of the motion.

den's lawyer advised that Trodden would not be testifying. He related that Trodden had helped dispose of the body after the defendant had murdered Pierce, and that Trodden would therefore assert his right against self-incrimination. Trodden was ultimately granted immunity, and testified before the grand jury and at trial under that grant of immunity.

Forensic evidence confirmed that Pierce had been shot twice in the back of the head, both shots being fired from the same gun held in close contact with the skin. Other forensic evidence was consistent with Trodden's account of how the body was dragged, and how the car had been driven in a bushy area along the tracks. Fingerprints in the vehicle matched those of the victim; there were no fingerprints matching those of either Trodden or the defendant. One of the defendant's neighbors confirmed seeing the defendant and Pierce going into the defendant's house on the night of the murder, and later seeing two men (who she assumed were again the defendant and Pierce) driving off in Pierce's car later that night. Yet another neighbor testified that she had been awoken that night and heard two or possibly three shots, followed by silence. She had not notified the police, thinking at the time that the noises might have come from a car backfiring.

b. *Presentation of the defense at trial.* At trial, defense counsel gave an opening statement in which he told the jury that the defendant, an "eyewitness" to the murder, would testify to a very different account of how the victim came to be shot on the railroad tracks behind the defendant's house.[3] Counsel outlined to the jury that Pierce's earlier fight with Alera was the event that precipitated the killing. He stated that Pierce's decision to pursue charges against Alera threatened Alera's job, and that Pierce also intended to sue the R & R and the Troddens for the injuries he had sustained in the fight. There would be evidence, counsel claimed, that Pierce was coming into the bar demanding money and threatening suit. Pierce's threats were hurting business, including the bar's "bookmaking" business. As a

---

[3]The opening statement also predicted that there would be various weaknesses in the Commonwealth's evidence: the lack of any motive for the defendant to kill Pierce; the lack of any fingerprint evidence, bloody clothes, or murder weapon; and the suspect nature of Trodden's immunized testimony.

result, the Troddens "had to do something." Counsel stated that, on the evening of October 4, Pierce was at the bar telling everyone there that he was looking for "satisfaction." Someone told Pierce to go to the defendant's house, that he would find Dennis Trodden there, and that Trodden wanted "to settle things up that night." Pierce then went to the defendant's house, expecting that Trodden would agree to a settlement. When he arrived, however, he began arguing with Trodden, and the defendant told them both to go outside. The defendant would testify, counsel claimed, that it was Trodden who suggested that they walk along the railroad tracks, and that the argument continued as the three walked along. Then, at a "prearranged spot," Trodden stopped, and three men emerged from the dark.[4] One of the men put the defendant on the ground, held a gun to him and told him to be quiet. The other two went up behind Pierce, with Pierce facing toward Trodden. Trodden then told Pierce that he was giving him "one last chance" to drop the idea of suing the bar and drop the charges against Alera. When Pierce refused, "those men" shot him twice in the head and dragged his body off to the side of the tracks. The man holding a gun on the defendant warned that the defendant would be killed if he said anything, and Trodden repeated the threat. One of the men then showed the defendant a photograph of his (the defendant's) family, warning that if he talked to anyone ("the State police," "the local police," "any cops, lawyer, anybody"), he would die. Trodden made it "very clear that these guys were serious." Trodden told the defendant to come with him and get Pierce's car, and the defendant saw Trodden and his three accomplices load the body inside. The defendant and Trodden then went back to the defendant's house for the rest of the night. The following morning, similar threats were made, warning the defendant that he and his family would be killed if he talked to "anybody."

When the various Commonwealth witnesses testified, defense counsel cross-examined them, asking them to agree with the

---

[4]At no point during the opening statement did counsel say who "those men" were, or what their relation to Trodden was, other than to say that Trodden had arranged their presence and that they were somehow affiliated with Trodden.

defense theory that Pierce had been threatening suit and adversely affecting the business at the bar. During the cross-examination of Trodden, defense counsel asked a detailed line of questions premised on the defense theory that Trodden had arranged for a group of accomplices to ambush Pierce along the railroad tracks and murder him if he refused to back down from his threatened lawsuit. When the witnesses (including Trodden) repeatedly answered in the negative to all such questions, the judge inquired of defense counsel what evidentiary basis there would be for the questions he was posing. Defense counsel explained that the defendant would testify and provide evidence of the version counsel was painting by his questions on cross-examination. Based on that representation, counsel was allowed to proceed. On two occasions during such cross-examination, the judge reminded the jury that an attorney's questions were not evidence, and that, unless and until there was evidence to support the premise of an attorney's question, a witness's denial in response to a question meant that there was no evidence of the facts suggested by the question.

However, when the defense began presenting its witnesses, defense counsel advised the judge that the defendant had decided not to testify.[5] The judge, acknowledging that the defendant still had an absolute right not to testify, expressed concern about the extent to which the jury had been exposed to suggestions of a defense version of events that would ultimately not be supported by any evidence at all (i.e., the theory of three men appearing along the railroad tracks as part of Trodden's ostensible prearranged plan to murder Pierce), and that the judge had allowed such questioning based on counsel's repeated representations that the defendant's testimony would provide an evidentiary basis for the scenario his questions had outlined. Counsel informed the judge that his representations to the court, and his questions to the witnesses, had been made in good faith because he had believed that he "had a witness" to substantiate them, and that he had so believed for the last ten months prior to trial. He advised that it was only that very afternoon that he had learned that he did not have such a witness.

---

[5] The circumstances surrounding the defendant's decision not to testify were the subject of the defendant's motion for a new trial, discussed *infra*.

At that point, the judge inquired of the defendant himself, asking him if he understood that he had the right to testify or not; that, if he testified, the prosecutor would be entitled to cross-examine him; that his final decision whether to testify did not have to be made at that time; and that he could continue to discuss the matter with counsel overnight,[6] change his mind, and decide to testify at any time the next day up until the moment that the defense rested. The defendant responded that he understood.

The following day, after the testimony of some further defense witnesses, counsel advised the judge that, after further consultation with the defendant, the defendant had again decided that he would not testify. The judge again conducted a colloquy with the defendant, reminding him that he had a right to testify and that he could still change his mind. The defendant acknowledged that he was aware of his rights, and confirmed that he had discussed the matter with counsel. After presenting one additional witness, the defense rested.

Through witnesses other than the defendant, the defense presented evidence of the earlier altercation between Pierce and Alera and Pierce's pursuit of a criminal complaint against Alera stemming from that incident.[7] However, the defense presented no evidence that the friction between Alera and Pierce had resulted in any animosity between Pierce and the Troddens, or that Pierce had made any threat to sue the R & R — the various witnesses called by the defendant denied that there was any such animosity or threat. And, in the absence of any testimony from the defendant, there was no evidence to support the theory that Trodden and a group of accomplices had killed Pierce.

2. *Discussion.* a. *Sufficiency of the evidence.* The defendant contends that his motion for a required finding of not guilty should have been allowed because there was insufficient evidence of deliberate premeditation. Viewed in the light most

---

[6]This colloquy took place shortly before 2 P.M., and court was then adjourned for the day because no other defense witnesses were available until the next morning.

[7]The defendant also called an expert witness to opine that, although the shots were fired at close range, the gun had not literally been in contact with Pierce's skin at the time the fatal shots were fired.

favorable to the Commonwealth, see *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), the evidence permitted the inference that the defendant had planned the killing of Pierce, and had orchestrated the trip along the railroad tracks for that purpose. He had then shot Pierce in the head twice, both shots being fired at point-blank range. These facts suffice to establish deliberate premeditation. See *Commonwealth* v. *Guy,* 441 Mass. 96, 102 (2004), and cases cited.

b. *Instruction on malice.* Without objection, the judge's instructions defined "malice" with reference to all three prongs of malice. This was error, as only first prong malice (a specific intent to kill) suffices for murder in the first degree on a theory of deliberate premeditation. See *Commonwealth* v. *Judge,* 420 Mass. 433, 441-442 (1995).[8] However, the error does not raise a substantial likelihood of a miscarriage of justice. Notwithstanding the erroneous definition of malice, the instruction on deliberate premeditation explained that the sequence of events began with "deliberation and premeditation, then the decision to kill, and lastly, the killing in furtherance of the decision." As we have often held, a correct instruction on deliberate premeditation, which requires that the jury find a "decision to kill," effectively requires the jury to find first prong malice, and thus the error in defining the other two prongs of malice does not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Murphy,* 442 Mass. 485, 498-499 (2004), and cases cited; *Commonwealth* v. *Reaves,* 434 Mass. 383, 393-394 (2001).

c. *Prosecutor's closing argument.* The defendant contends that the prosecutor's closing argument improperly commented on the fact that the defendant did not testify.[9] The context and purpose of the prosecutor's remarks was to point out that the witnesses the defendant had called had not provided any evidence to support the version of events that had been sug-

[8]The defendant's trial was conducted prior to this court's decision in *Commonwealth* v. *Judge,* 420 Mass. 433 (1995).

[9]At trial, defense counsel objected to the prosecutor's closing argument on the ground that it had improperly shifted the burden of proof by suggesting that the defense had failed to put forth evidence to prove that someone else had killed the victim. On appeal, the defendant reframes his claim as one of improper commentary on the defendant's decision not to testify.

gested by defense counsel's questioning of witnesses.[10] The specific remarks that the defendant claims were improper ("What witnesses did the defense call to help you answer the question of who shot James Pierce?" and "Did the defense produce any evidence through their witnesses in this trial . . . ?") would, standing alone, erroneously suggest that the defendant had some obligation to put on evidence and explain who committed the murder. Although we are satisfied that the context of these problematic statements by the prosecutor, combined with the judge's instructions on the burden of proof and the defendant's election not to testify,[11] rendered the statements harmless, prosecutors should scrupulously avoid any statement that suggests that the defendant has any burden to produce evidence. Here, the point that the prosecutor was legitimately seeking to make could have been articulated using slightly different phraseology that would have avoided any such suggestion. The context, however, ultimately made clear that counsel was pointing out that the witnesses who *were* called by the defense (each of whom he proceeded to identify by name immediately after his question about "[w]hat witnesses did the defense call") knew nothing about the murder, and that their testimony provided no support

---

[10]"What was the defense? What witnesses did the defense call to help you answer the question of who shot James Pierce? Did Robert Moulaison help you answer that question? No. Did Robert Trodden? No. Did Dennis Alera? No. Did Dr. Sussman? No. Were any of those people up on the railroad tracks on October the fifth? No. Can they help you decide this case? No.

". . . .

"You see, from day one in this case, ladies and gentlemen, the defense in its strategy in this case is to throw a lot of things before you. Do you remember those questions? Isn't it true Dennis Trodden X, Y and Z? Isn't it true this happened? Isn't it true, isn't it true, isn't it true? And you know what? What was every single answer to these grandiose questions throwing out facts before you. What was the answer to every question? No. Did the defense produce any evidence through their witnesses in this trial to back up those questions? No. Dennis Trodden answered one of those questions with, that's just a fairy tale. The Commonwealth suggests that's all the questions were were fairy tales."

[11]The judge gave a forceful instruction about the defendant's right not to testify, advising the jury that they could draw no inference from the fact that he had not testified, and reminded them that "the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

for the defense theory that had been articulated in counsel's questions. He was not commenting on any failure to call witnesses (a comment that would improperly shift the burden of proof), but rather on the fact that the witnesses presented had not supplied any useful information on the critical issue in the case. That the defense theory of the case was based on a "fairy tale" and not on any evidence was a point that the prosecutor could properly argue.

Nor did these remarks constitute improper comment on the defendant's decision not to testify (the specific error now raised on appeal, see note 9, *supra*). Cf. *Commonwealth* v. *Gouveia*, 371 Mass. 566, 570-571 (1976). The observation that the witnesses called by the defendant had not been "up on the railroad tracks" that night was intended to contrast those witnesses with Dennis Trodden, whose testimony had been discussed in the immediately preceding paragraph of the prosecutor's closing. And, as discussed above, the question, "What witnesses did the defense call?," was an introduction to a discussion about the various witnesses who had in fact testified, not a criticism of the defendant for not taking the stand. We are satisfied that the context of the prosecutor's challenged remarks was proper, and that, to whatever extent (if any) the jury might have initially misinterpreted them, that proper context was thereafter made clear and the judge's instructions sufficed to correct any remaining misinterpretation. *Id.* at 572 ("reliance on curative instructions may be proper, in the judge's discretion, even in a case of clearly improper argument by a prosecutor").

The defendant also contends that the prosecutor misstated the evidence when he suggested to the jury that Pierce "drove around the block" prior to his encounter with the defendant and Trodden. There was no misstatement of the evidence. The defendant had sought to undermine Trodden's credibility by arguing that Pierce had already left the area prior to the time that Trodden claimed that he and the defendant had seen him and invited him back to the defendant's house. In that same vein, he had suggested that Pierce's direction of travel made it impossible for him to have been seen heading in the opposite direction from the defendant's vehicle in the manner that Trodden had described. The prosecutor introduced evidence that it was in fact possible for Pierce to have driven "around the

block" and to have thereby returned to the area and be driving in the direction Trodden identified. Based on that possibility and Trodden's testimony as to when and where they encountered Pierce, the jury could have inferred that a trip "around the block" (or, for that matter, any other means of simply turning his vehicle around) was how Pierce had returned to the area of the restaurant at the time that Trodden and the defendant were leaving. The prosecutor's point in closing argument was not to assert categorically that Pierce had gone "around the block," but to point out that the ostensible discrepancy being urged by defense counsel was readily explainable and therefore did not make Trodden a "liar."[12] We see no impropriety in the argument.

3. *Motion for a new trial.* In his motion for a new trial, the defendant contended that, as of the time he made his decision not to testify, he had become incompetent to stand trial. He also alleged ineffective assistance of counsel in connection with counsel's failure to take steps prior to trial to address the issue of competency, and his failure to take appropriate steps to raise the issue when it emerged during trial. Finally, he asserted that his counsel was ineffective in that he should not have based his opening statement on the premise that the defendant would testify. After an evidentiary hearing, the judge (who had also presided at trial) denied the motion. We see no error.

a. *Competence to stand trial.* The judge heard testimony from the lawyers who had represented the defendant at trial, an expert witness for the defendant (who had examined the defendant approximately three years after trial), and an expert witness for the Commonwealth. The judge found that, immediately following indictment, the defendant had been treated at the jail for anxiety and depression. Within two months of his arrest, the defendant was sent to Bridgewater State Hospital. There, he was diagnosed with mild to moderate depressed mood and anxiety, not requiring hospitalization. He was returned to the county jail that same month. The trial began approximately seven months later.

---

[12] "And he went around the block and came back, and they bumped into each other. Isn't that what happened based on the evidence? What is the big deal? . . . [Defense counsel] wants you to get hung up on where they met on Broadway or whether they went around the block or not."

The defendant's appointed counsel was assisted on the case by the defendant's cousin, who was also a lawyer. They met with the defendant on a number of occasions, and the defendant gave them his version of how the murder took place. Although initially expressing fear that his family would be harmed if he were to testify, and still exhibiting some anxiety, the defendant ultimately became "adamant" that he would testify to his version of events. At no time did either attorney question the defendant's competency, and the defense expert testified that the defendant was in fact competent to stand trial up until the day that he changed his mind and decided not to testify.

Both counsel testified that on the first day that they began to present defense witnesses, they met with the defendant in the lockup during a recess and indicated that the time had come for him to testify. To their great surprise, the defendant, sobbing uncontrollably and expressing fear for his family's safety, indicated that he could not testify. This scene lasted approximately fifteen minutes. Counsel advised the defendant that he had to compose himself to return to court, which the defendant did. At that point, the judge was informed that the defendant would not be testifying, but was not told anything about the defendant's emotional outburst in the lockup. The judge conducted a colloquy with the defendant. During the colloquy, the judge observed that the defendant appeared calm, composed, and coherent, and the defendant expressed an understanding of what the judge was telling him. The following day, the defendant again appeared calm and rational to the judge, and again exhibited an understanding of that day's colloquy.

At the evidentiary hearing, the defense expert opined that the defendant was incompetent at the time he informed his lawyers that he would not testify.[13] That opinion was premised on the assessment that the defendant was suffering from posttraumatic stress disorder (brought on by the traumatic events he had

---

[13]The defense expert agreed that the defendant still had a rational understanding of the proceedings, but opined that the defendant then lacked the ability to consult with his lawyer. See *Commonwealth* v. *Russin*, 420 Mass. 309, 317 (1995), quoting *Dusky* v. *United States*, 362 U.S. 402, 402 (1960).

ostensibly witnessed on the night of the murder) and major depression. The judge did not credit that opinion, as it was contrary to the Bridgewater State Hospital diagnosis of the defendant and to his own observations of the defendant during trial and during the two colloquies on the subject of his testifying. The judge credited the opinion of the Commonwealth's expert, who opined that the defendant's emotional displays were the result of anxiety and depression precipitated by his legal predicament. That opinion comported with the judge's own observations, and was consistent with the observations of the defendant in the Bridgewater State Hospital records.

We give substantial deference to a trial judge's determination of a defendant's competence to stand trial, see *Commonwealth v. Lyons*, 426 Mass. 466, 469 (1998), recognizing that the judge has had the "opportunity to observe the defendant's demeanor during the trial," *Commonwealth v. Russin*, 420 Mass. 309, 317 (1995). See *Commonwealth v. L'Abbe*, 421 Mass. 262, 266-267 (1995). Here, the judge heard evidence from two experts, and determined that the Commonwealth's expert was the more credible. The defendant points to no error in the judge's findings and conclusions, but effectively asks us to substitute our assessment of the expert testimony for that of the judge, who both heard the testimony and observed the defendant over the course of seven days of trial.

The judge did credit the attorneys' testimony with respect to their observations of the defendant's "breakdown" at the time he told them he would not testify. However, the fact that the defendant had an emotional outburst outside of the court room on one day during trial does not compel the judge to find that he had become incompetent. See, e.g., *Commonwealth v. Laurore*, 437 Mass. 65, 78-79 (2002) (suicidal defendant "screaming" and "crying uncontrollably" in cell; no error where, after colloquy, judge proceeded with trial next day without conducting competency hearing); *Commonwealth v. DeMinico*, 408 Mass. 230, 234-235 (1990) (defendant competent despite expert opinion that he suffered psychotic episode during trial). See also *Commonwealth v. Hung Tan Vo*, 427 Mass. 464, 466-468 (1998). However extreme the defendant's emotional outburst at the time he told his lawyers that he would not testify, the

defendant regained his composure within minutes thereafter, and participated calmly in the first colloquy with the judge on the subject of his right to testify. As the judge made clear to the defendant during that colloquy, the final decision whether to testify did not need to be made until the defense rested (which happened after some additional witnesses were presented the following day). There was no evidence to suggest that the defendant relapsed into uncontrollable emotional outbursts or that he had any arguably irrational interactions with his lawyers at any time after that initial colloquy. Nor was there any emotional episode on the day that the defendant actually made the final decision not to testify and participated in the second colloquy. There was no error in the judge's assessment that, despite his single outburst, the defendant was competent to stand trial.

b. *Ineffective assistance of counsel with respect to the defendant's competency.* Our ruling that there was no error in the judge's findings on the issue of the defendant's competency effectively disposes of the defendant's claims of ineffective assistance of counsel with respect to that same issue. The defendant contends that his counsel was ineffective in failing to raise the issue of competency with the judge prior to trial. However, as the defendant's own expert opined, the defendant *was* competent at that time. Thus, there was no issue to bring before the judge.

The defendant further claims that counsel should have raised the issue of competency after the defendant exhibited severe emotional distress and indicated that he would not testify. In light of the later finding that the defendant was competent at that time, despite his outburst, there has been no showing that raising the issue earlier would have made any difference to the defense. It is mere speculation to suggest that a more prompt inquiry into the defendant's competency would have resulted in a different finding.

The defendant also suggests that, in the wake of his decision not to testify, counsel should have asked for a mistrial. He offers no authority in support of the proposition that a competent defendant's decision about how to proceed during trial justifies declaring a mistrial. A defendant's poor strategic decision

contrary to counsel's advice — here, a midtrial about-face that severely undermined the defense position outlined in the opening statement — would not be ground for a mistrial.

c. *Ineffective assistance of counsel during opening statement.* The defendant also contends that his counsel was ineffective when he premised the "dramatic" opening statement on the assumption that the defendant would testify. Suggesting that counsel should have foreseen the possibility that the defendant would change his mind and not testify, he argues that counsel's announcement to the jury that the defendant would testify was "simply foolish" and caused "extraordinary prejudice."

We recognize that failure to present critical evidence that has been announced in an opening statement can have drastic ramifications. See *Commonwealth* v. *Duran,* 435 Mass. 97, 109 (2001). See also *Ouber* v. *Guarino,* 293 F.3d 19, 33-34 (1st Cir. 2002); *Anderson* v. *Butler,* 858 F.2d 16, 18-19 (1st Cir. 1988). However, failure to produce evidence that counsel has predicted in an opening does not automatically amount to ineffective assistance of counsel. *Commonwealth* v. *Duran, supra.* Rather, we must look to whether the opening statement "reflected inadequate preparation, incompetency, or inattention," *Commonwealth* v. *Nardone,* 406 Mass. 123, 127 (1989), and whether the subsequent failure to produce the evidence was "a decision forced upon [counsel] by events over which he had no control," *id.,* or otherwise was supported by "strategic justifications," *Commonwealth* v. *Duran, supra* at 110. There is, in any opening statement, a risk that promised evidence will not materialize. The decision whether to make an opening statement, and, if so, what details to include in that statement, are purely strategic, and the strategic benefit of announcing specific anticipated testimony in the opening statement may outweigh the risk that the testimony will not be available. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland* v. *Washington,* 466 U.S. 668, 690 (1984).

At the hearing on the motion for a new trial, trial counsel testified that he thoroughly expected the defendant to testify at trial, describing him as "adamant" that he wanted to testify, and that "nobody was going to keep him off the stand, absolutely

nobody." The defendant's attorneys had spent "many hours" preparing him to testify, including mock exercises to simulate direct and cross-examination, going through his proposed testimony "in minute detail." Given the information that counsel had, there was nothing manifestly unreasonable in structuring the defense around the defendant's planned testimony, and nothing manifestly unreasonable about the decision to give the jury the defendant's version as part of the defense opening. That the opening statement was "dramatic" is not a sign of ineffectiveness — if the defense is going to present an opening statement, valid strategic reasons support making it a "dramatic" one.

Both counsel were "shocked" when the defendant later decided that he would not testify. When the defendant told counsel that he would not testify, they attempted to persuade him to adhere to the original strategy, pointing out to him that the jury had already been told he would present his own version of events. When the defendant insisted that he would not take the stand, counsel was presented with "a decision forced upon him by events over which he had no control." *Commonwealth* v. *Nardone, supra.* Cf. *Commonwealth* v. *DeCicco,* 44 Mass. App. Ct. 111, 122 (1998) (without consultation with defendant, counsel's opening predicted that defendant would testify; counsel later decided not to call defendant as witness). The record amply supports the judge's determination that the defense opening was a strategic decision that had failed through no fault of counsel.

4. *G. L. c. 278, § 33E.* The defendant asks that we exercise our power under G. L. c. 278, § 33E, and order a new trial. We decline to do so. The grounds for the defendant's request for relief largely track the same issues addressed above. He also suggests that, apart from those alleged errors, we can have "no confidence in the accuracy" of the verdict, because it was Trodden who arranged for the murder of Pierce and then intimidated the defendant to the point that he was too emotionally distressed to testify.[14] Our power to grant G. L. c. 278, § 33E, relief does not allow us to sit as a second jury. Ostensible discrepancies in

---

[14]Ironically, the defendant himself stated to the experts who examined him that, if he were granted a new trial, he would still not testify. As such, there is no reason to believe that the evidence on any retrial would include the

Trodden's testimony, and the ramifications of Trodden's grant of immunity, were amply presented to the jury below. Notwithstanding what turned out to be an unfortunate strategic decision to base the opening statement on the anticipated testimony of the defendant, defense counsel's cross-examination of witnesses was thorough, highlighting their biases and prior inconsistent statements, and his presentation of defense witnesses contested various details of Trodden's testimony. We see no basis for setting aside the jury's decision to credit Trodden's version of events.

5. *Conclusion.* For the foregoing reasons, the judgment is affirmed; the order denying the defendant's motion for a new trial is affirmed; and the defendant's request for relief under G. L. c. 278, § 33E, is denied.

*So ordered.*

---

defendant's version of events. We also note that the defendant's conduct after the shooting — voluntarily contacting the police, suggesting various other suspects (including members of the Trodden family), and expressing eagerness to testify before the grand jury — is wholly inconsistent with his claim that Trodden and his accomplices threatened to kill him and his family if he spoke to the police, to a lawyer, or to "anybody."