2010 UT App 157

STATE of Utah, Plaintiff and Appellee,

v.

Stephen James WALKER, Defendant and Appellant.

No. 20070931–CA.

Court of Appeals of Utah.

June 17, 2010.

Ronald Fujino, Salt Lake City, for Appellant.

Mark L. Shurtleff and Ryan D. Tenney, Salt Lake City, for Appellee.

Before Judges McHUGH, THORNE, and ROTH.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 Stephen James Walker appeals from his conviction for murder, a first degree felony, *see* Utah Code Ann. § 76–5–203 (Supp. 2009).[1] Walker argues that his counsel performed ineffectively by failing to introduce an expert witness after discussing Walker's mental illness during opening arguments, by failing to move to suppress Walker's police interview on the grounds that the interrogators did not provide him sufficient warnings (*Miranda* warnings) in compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and by failing to object to an alleged error in the transcript of that police interview. We affirm.

## BACKGROUND

¶ 2 Walker suffers from post-traumatic stress disorder (PTSD) as a result of his service in Vietnam and was classified by the federal government as completely disabled. Walker and his wife, Cassandra Bryan, were married in 1998, but the relationship was unstable. At one point, the couple divorced, reconciled, and then remarried.

¶ 3 On April 1, 2006, Walker and Cassandra had several contentious telephone conversations, followed by Walker visiting Cassandra while she was working. Witnesses testified that Cassandra was upset by the conversations, removed her wedding ring, threatened to throw the ring away, and stated that "she hated [Walker] and ... wanted to divorce him." Cassandra also expressed concern that Walker had removed funds from their joint bank account.

¶ 4 Cassandra left work around 3:00 p.m. At about 5:30 p.m. a neighbor saw Cassandra "coming quickly out" of her house and Walker "coming after her." On the way to the car, Cassandra dropped her wallet. When Walker tried to hand it to her, she drove away without it.

¶ 5 Around 7:30 p.m., Walker called his friend, threatened "to shoot himself in the head," and then hung up. Almost immedi-

---

1. The relevant portions of the Utah Code have not changed substantively since those in effect at the time of the trial. We cite to the current version for the convenience of the reader.

ately, Walker called the friend again, apologized for bothering him, and then hung up abruptly. The friend asked an acquaintance to accompany him to Walker's house to check on the situation. When they arrived, Walker was drunk on the living room floor, and they could see Cassandra lying dead on the kitchen floor in a pool of blood. The friend called the police while his acquaintance attempted to calm Walker.

¶ 6 While waiting for the police, Walker repeatedly stated that he wanted to kill himself. He also said something about Vietnamese children and "why don't they just feed them." Upon arrival, the police noted that Cassandra was dressed in a heavy coat and had her purse over her shoulder. It was later discovered that the wallet she had dropped earlier was inside the purse. Cassandra had been shot thirteen or fourteen times. Her clothes, nurse's uniform, and toiletries were found in her car.

¶ 7 The police placed Walker under arrest and transported him to the Salt Lake City Police Department, where he was interviewed. Detectives made a video of the interview, creating both a visual and audio record. That video was not offered as evidence at trial. According to a written transcript of the interview,[2] before asking any questions, the detectives gave Walker a partial *Miranda* warning but failed to advise him that anything he said could be used against him.

¶ 8 During the course of the interview, Walker expressed surprise at his wife's death and confusion as to how it had happened:

[Walker]: Cassandra is Bryan[ ] ... Bryan is dead?

[Det. K]: Yes, sir.

[Walker]: Car wreck?

[Det. W]: No, it wasn't a car wreck.

[Walker]: Please.

. . . .

[Det. W]: Well, she was found shot to death in your home.

[Walker]: What?

After the detectives elicited additional statements about an argument between Cassandra and Walker concerning home remodeling, Walker requested an attorney, and the detectives stopped the interrogation.

¶ 9 The transcript of the interview also reflects the following exchange:

[Det. K]: You were the only one there with her.

[Walker]: I don't want her leaving me.[3]

At trial, the prosecution quoted Walker's statement, as reflected in the transcript, in both the opening and closing arguments. One of the detectives present during the interrogation also testified that Walker made this statement.[4]

¶ 10 During voir dire of the jury venire, the trial court indicated that the defense may offer mental health as a potential defense. Dr. Vickie Gregory, a neuropsychologist who examined Walker, was prepared to testify that Walker was suffering from PTSD at the time of the shooting. Although defense counsel named Dr. Gregory as a potential witness during voir dire, the defense did not call her to testify and ultimately did not request a mental health jury instruction. Instead, Walker presented three alternative defenses in an attempt to convince the jury that he was guilty of manslaughter rather than murder: voluntary intoxication, *see* Utah Code Ann. § 76–2–306 (2008); extreme emotional distress, *see id.* § 76–5–205.5(1)(b) (Supp.2009); and imperfect self-defense, *see id.* § 76–5–203(4)(a).

¶ 11 After a three-day trial, the jury found Walker guilty of murder, and the trial court sentenced him to an indeterminate term of six years to life in prison.

---

2. The transcript itself was never actually admitted into evidence.

3. Walker disputes that he said, "I don't want her leaving me," and contends that the video is inaudible concerning Walker's response to the detective's question.

4. It is unclear whether the detective testified from his own recollection of the statement or from his review at trial of the written transcript. The detective reviewed the page of the transcript containing the alleged statement, "I don't want her leaving me," while testifying as to other statements made by Walker during the interview.

ISSUES AND STANDARD OF REVIEW

¶ 12 Walker claims that he received ineffective assistance of counsel because his attorney (1) declined to call an expert witness after promising the jury evidence of mental illness during voir dire and in the opening statement; (2) did not move to suppress Walker's interrogation for lack of sufficient *Miranda* warnings; and (3) failed to challenge the accuracy of the transcript of the interrogation.

▆▆▆ ¶ 13 " 'An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law,' which we review for correctness." *State v. Cox*, 2007 UT App 317, ¶ 10, 169 P.3d 806 (quoting *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162). To support an ineffective assistance of counsel claim, a defendant must demonstrate, first, "that counsel's performance was deficient" and, second, "that counsel's deficient performance was prejudicial." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In evaluating counsel's performance, "an ineffective assistance claim succeeds only when no conceivable legitimate tactic or strategy can be surmised from counsel's actions," *State v. Tennyson*, 850 P.2d 461, 468 (Utah Ct.App.1993), and "[w]here the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of a finding that counsel performed effectively," *Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. To show prejudice, a defendant must establish that "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

5. Walker never denied that he shot and killed his wife. Instead, he argued that he was guilty of manslaughter rather than murder. *Compare* Utah Code Ann. § 76–5–203(2) (Supp.2009) (providing that criminal homicide is murder when it is committed knowingly, intentionally, or "with depraved indifference to human life"), *with id.* § 76–5–205 (2008) (providing that criminal homicide is manslaughter when it is committed

ANALYSIS

I. Failure to Call Expert Witness

▆▆ ¶ 14 First, Walker contends that he received ineffective assistance because defense counsel did not call Dr. Gregory to testify regarding Walker's PTSD and how it impacted Walker's actions on the night he admits he shot Cassandra.[5] "[C]ounsel's decision to call or not to call an expert witness is a matter of trial strategy, which will not be questioned and viewed as ineffectiveness unless there is no reasonable basis for that decision." *State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993). Because counsel's decision not to call Dr. Gregory was a reasonable tactical decision, it does not support Walker's ineffective assistance claim.

A. Expert Testimony Was Not Essential to Walker's Defense.

▆▆ ¶ 15 Walker contends that "the series of facts" outlined in defense counsel's opening statement "could not be supported without the testimony of an expert witness." Walker compares his situation to that of the defendant in *State v. Hales*, 2007 UT 14, 152 P.3d 321, whose attorney failed to obtain an expert to provide a competing interpretation of the defendant's CT scans, *see id.* ¶ 69. However, in that case, the court held that it was the lack of *investigation* that rendered counsel's assistance ineffective, not the ultimate strategic decision to provide no expert testimony. *See id.* ¶ 83. Indeed, the *Hales* court expressly noted that although the defense's strategic decisions may have proven reasonable once a full investigation was conducted, " 'because the investigation supporting their choice was unreasonable,' " the defendant's attorneys " 'were not in a position to make a reasonable strategic choice.' " *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 536, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). *See*

recklessly; when an affirmative defense exists because it was committed under a reasonable belief that the circumstances provided legal justification for the act, pursuant to Utah Code section 76–5–203(4); or when special mitigation exists because it was committed as a result of mental illness or extreme emotional distress, as provided by Utah Code section 76–5–205.5(1)).

*generally Raley v. Ylst,* 470 F.3d 792, 800–01 (9th Cir.2006) (holding that presenting "a mental defect argument to the jury without the support of expert testimony" is permissible where the decision is based on "reasonable investigation and . . . a reasonable strategic choice"). Walker makes no argument that defense counsel's ultimate decision not to call Dr. Gregory was made in the absence of a reasonable investigation into Walker's mental capacity. Consequently, *Hales* is not applicable here.[6]

¶ 16 Furthermore, we agree with the State that Dr. Gregory's testimony was not critical because the defense was able to address Walker's PTSD by cross-examining the State's lay witnesses. Specifically, defense counsel elicited testimony that Walker was actively involved in a disabled veterans group, suffered from PTSD, was being regularly medicated, was completely disabled as a result of his PTSD, had previously confronted his wife with a gun when she startled him, and may have been experiencing a flashback at the time of the shooting.[7]

B.  There Were Plausible Strategic Reasons for Abandoning the Mitigation Defense Based on Mental Illness.

¶ 17 The State also contends that a mitigation defense based on mental illness was inconsistent with Walker's other proffered defenses. Rather than pursuing the mental illness defense, counsel relied upon three alternative defenses in the hope of convincing the jury to convict Walker of a lesser level of criminal homicide: imperfect self-defense, extreme emotional distress, and voluntary intoxication. We agree with the State that none of these defenses is consistent with a mitigation defense predicated on mental illness.

¶ 18 First, the affirmative defense of imperfect self-defense required the jury to find that Walker "caused [Cassandra's] death . . . under a *reasonable* belief that the circumstances provided a legal justification or excuse for [his] conduct." Utah Code Ann. § 76–5–203(4)(a) (Supp.2009) (emphasis added). In contrast, to prove mitigating circumstances based on mental illness, Walker must have been delusional to the extent that "if the facts existed as the defendant believed them to be in the delusional state, those facts would provide a legal justification for the defendant's conduct," *id.* § 76–5–205.5(1)(a)(ii). Defense counsel could have reasonably concluded that the jury would be less likely to find that Walker acted reasonably, as required for an imperfect self-defense claim, if expert testimony established that he was suffering from a mental illness-induced delusion that caused him to shoot Cassandra.

¶ 19 Walker also argued that he should be found guilty of manslaughter rather than murder because he was suffering from ex-

---

6.  After oral argument, Walker submitted a letter, pursuant to rule 24(j) of the Utah Rules of Appellate Procedure, directing us to the supreme court's recent decision in *State v. Drej,* 2010 UT 35, 656 Utah Adv. Rep. 31, 233 P.3d 476. In *Drej,* the supreme court, in affirming that it is constitutional for the defendant to carry the burden of proof for special mitigation defenses, noted that "the evidence and facts related to the presence of special mitigation are entirely within the knowledge, memory, and mental processes of the defendant." *Id.* ¶ 38. The court also distinguished special mitigation from affirmative defenses by opining that "[s]pecial mitigation is not based on the objective facts surrounding the defendant, but rather is concerned entirely with what is going on in the mind of the defendant and whether the delusion in question would lead a person to act the way the defendant did." *Id.* Walker argues that special mitigation on the basis of a mental delusion cannot, therefore, be established without expert testimony regarding Walker's mental state. However, Dr. Gregory's anticipated testimony related to Walker's PTSD, and Walker never submitted a mental illness defense to the jury. The only "special mitigation" defense he advanced was extreme emotional distress, a defense that is negated if the emotional distress was the result of mental illness, *see* Utah Code Ann. § 76–5–205.5(3)(a) (Supp.2009).

7.  Because evidence of Walker's mental health was presented, however, we are less convinced by the State's alternative argument that defense counsel's decision was designed to prevent the State from presenting damaging rebuttal. While the State's expert was prepared to rebut Dr. Gregory's methods and conclusions, the failure to offer a defense expert on PTSD may not have insulated Walker from all risk. Where the defense elicited evidence concerning Walker's PTSD, it is possible the trial court would have permitted the State to offer its expert to refute the claim that Walker was suffering from, or that the crime was committed as a result of, PTSD.

treme emotional distress. Although extreme emotional distress is a mitigating factor that may reduce the level of a criminal homicide, *see id.* § 76–5–205.5(1)(b), the statute expressly excludes extreme emotional distress "resulting from mental illness," *see id.* § 76–5–205.5(3). Thus, the more emphasis defense counsel placed on Walker's PTSD, the more Walker's extreme emotional distress mitigation defense would be undermined.

¶ 20 The affirmative defense of involuntary intoxication is likewise incompatible with a mental health defense:

> A defendant who was under the influence of voluntarily consumed, injected, or ingested alcohol, controlled substances, or volatile substances at the time of the alleged offense *may not claim mitigation* of the offense ... on the basis of mental illness *if the alcohol* or substance *caused, triggered, or substantially contributed to the mental illness.*

*Id.* § 76–5–205.5(2) (emphases added). In this case, there was ample evidence that Walker was extremely intoxicated. The police detectives, Walker's friend, and his friend's acquaintance all testified about Walker's drunken state. Consequently, any mental illness mitigation defense was vulnerable to attack from the State based on evidence that Walker's voluntary intoxication substantially contributed to any alleged flashback that caused him to shoot Cassandra.

¶ 21 Under the facts of this case, there are plausible tactical reasons why defense counsel might have chosen to pursue the other mitigating factors rather than mental illness. Consequently, we hold that Walker has not met his burden of establishing that defense counsel's performance was deficient in this regard. *See Villafuerte v. Stewart,* 111 F.3d 616, 630 (9th Cir.1997) (holding that counsel was not ineffective for failing to pursue mutually exclusive defense theories at trial); *accord Nadir v. State,* 505 N.E.2d 440, 442 (Ind.1987).

C.   Defense Counsel Did Not Make a Definitive Promise to the Jury That Rendered the Failure to Produce Dr. Gregory Deficient.

¶ 22 Walker argues that even if the decision not to call Dr. Gregory would have been reasonable under normal circumstances, the fact that the trial court referenced mental illness during voir dire and defense counsel did so in the opening statement renders counsel's performance deficient here. In support of this position, Walker relies on the First Circuit's decision in *Anderson v. Butler,* 858 F.2d 16 (1st Cir.1988), which involved facts similar to those present in this case.

¶ 23 In *Anderson,* the defendant killed his wife by stabbing her multiple times. *See id.* at 16–17. As in this case, the defendant there did not seek a not guilty verdict or plead insanity; rather, he claimed that his mental state at the time of the crime required that he be found guilty of manslaughter or second degree murder, as opposed to first degree murder. *See id.* at 17. During voir dire, the jurors were asked about their acceptance of psychiatric testimony. *See id.* At the close of the State's case-in-chief, defense counsel delivered the defense's opening statement and "told the jury that he would call a psychiatrist and a psychologist, whose testimony would show that defendant was walking unconsciously toward a psychological no exit.... Without feeling, without any appreciation of what was happening, [the defendant] on that night was like a robot programmed on destruction." *Id.* (omission in original) (internal quotation marks omitted). Notwithstanding the fact that the doctors upon whose reports these assertions were based were available, defense counsel rested the following day without calling them to testify; instead, the defense relied solely upon the testimony of lay witnesses. *See id.* In closing argument, defense counsel stated, "I had intended to try and persuade you with fancy medical and clinical terminology. But there is no amount of psychiatric and psychological evaluations that were going to present a better picture of what you have already heard." *Id.* at 17 n. 1 (internal quotation marks omitted).

¶ 24 On appeal, the majority decision held that defense counsel's performance was deficient, reasoning, "[W]e might have no quarrel with counsel's decision to call, or not to call [the experts], as a strategic decision, had

that matter stood alone ..., but counsel's choice .... was made in the posture of jurors having heard, only the day before, that a psychiatrist and a psychologist would testify...." *Id.* at 18. Judge Breyer dissented, noting that to obtain the most favorable verdict of manslaughter the defense had to establish that the defendant's actions were the result of a provocation sufficient to make an "ordinary man" angry enough to eclipse his capacity for self-control. *See id.* at 20 (Breyer, J., dissenting). Because the expert testimony would have been contrary to a finding that the defendant was an "ordinary man," thereby undermining the chance for a manslaughter conviction, the dissent concluded that the " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' " had not been overcome. *See id.* at 19 (quoting *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

¶ 25 According to Walker, the same decision reached by the *Anderson* majority is appropriate here because the jury was primed for a mental health defense that was not delivered. Even if we were compelled to follow decisions from the First Circuit, we would find *Anderson* distinguishable. The information provided to the jury before trial here was less certain than that presented in *Anderson.* For example, defense counsel in this case hoped not to introduce witnesses during voir dire because the defense was not certain who actually would testify.[8] In addition, the trial court emphasized that it did not know what specific evidence might be offered in support of a mental health defense or even whether such a defense would be offered:

> If the Defendant chooses, and I don't know whether he will or not, or what the specifics would be, but if he chooses to do so, he may offer mental health as a potential defense.... If he does so, you'll hear specific[ ] evidence, testimony about that particular mental illness and its effect on him maybe from both sides in the case. Again, I'm not sure what that evidence would be. I don't know the specifics of it, and I guess I'm not absolutely certain whether that evidence, that kind of evidence would be presented.

Thus, unlike in *Anderson,* where the damage done by defense counsel's opening statement was exacerbated by voir dire questions regarding the ability of jurors to accept psychiatric testimony, the trial court and counsel in this case were careful during voir dire not to lead the jury to expect that a mental health defense would be presented.[9]

■ ¶ 26 Defense counsel in this case refrained from making any promises to the jury, which preserved the defense's ability to respond as needed throughout the trial. Indeed, developments in the course of a trial will often prompt legitimate changes in strategy. *See id.* at 19–20 (concluding that a change in trial strategy is not ineffective assistance of counsel and citing cases supporting that proposition). Where counsel has adequately prepared and made reasonable investigation, remaining uncommitted to a specific trial strategy or changing strategy mid-trial is not necessarily deficient performance. *See Ouber v. Guarino,* 293 F.3d 19, 28 (1st Cir.2002) ("It is easy to imagine that, on the eve of trial, a thoughtful lawyer may remain unsure as to whether to call ... a witness."); *Turner v. Williams,* 35 F.3d 872, 904 (4th Cir.1994) (refusing to impose a requirement on "defense counsel to continue to pursue a trial strategy even after they conclude that the original strategy was mistaken or that the client may be better served by a different strategy"), *overruled on other grounds by O'Dell v. Netherland,* 95 F.3d 1214, 1222 (4th Cir.1996).

8. Counsel did ultimately name their witnesses during voir dire, at the request of the judge, solely to determine whether any of the jurors personally knew the witnesses.

9. Even *Anderson* does not indicate that questioning jurors about their ability to accept expert psychological testimony during voir dire would lock defense counsel into a strategy that necessarily includes expert testimony absent additional emphasis, such as an opening statement promising such testimony. Thus, Walker's contention that asking mental health questions during voir dire required the defense to produce an expert is questionable, even if the court and defense counsel had not taken the precautions they did.

¶ 27 Failing to produce promised evidence, however, may constitute deficient performance if the reasons prompting the change in strategy were known to counsel at the time the opening statement was made. *See United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 259 (7th Cir.2003) ("Making ... promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy."); *cf. Turner*, 35 F.3d at 904 ("[A]ssuming counsel *does not know at the time of the opening statement* that he will not produce the promised evidence, an informed change of strategy in the midst of trial is virtually unchallengeable." (emphasis added) (internal quotation marks omitted)).[10] Therefore, where counsel is unsure of the most effective trial strategy, it is prudent to guard against creating expectations in the jury that may ultimately not be fulfilled. *See generally Ouber*, 293 F.3d at 28 (noting that counsel's decision not to call his client may not have been ineffective if counsel had not made a specific promise in the opening statement); *Anderson v. Butler*, 858 F.2d 16, 18 (1st Cir.1988) (holding that even if proper under normal circumstances, "it was inexcusable to have given the matter so little thought at the outset as to have made [an] opening promise" when it was foreseeable that experts would not be called).

¶ 28 Walker suggests that his counsel's decision not to present a mental health defense was not a new development, but simply the result of counsel's "inability to decide on a theory of the case." He argues that his counsel was, therefore, "ineffective in not having a trial strategy at the outset and .... mak[ing] such a fundamental decision, in the midst of trial after the State's case-in-chief and after defense promises had been made, on an issue as big as whether to call an expert witness." Although defense counsel was uncertain whether to use Dr. Gregory's expert testimony, even in the midst of the trial, defense counsel's previous statements did not lead the jury to expect that they would hear from Dr. Gregory. Counsel did not mention Dr. Gregory specifically, or even experts generally, in the opening statement and was careful not to promise particular testimony or evidence. This, combined with counsel's reluctance to identify defense witnesses during voir dire because of the uncertainty concerning whether they would be called, indicates a conscious decision to maintain flexibility.

¶ 29 Furthermore, where counsel promises the jury a category of evidence (e.g., expert testimony) rather than a distinct piece of evidence (e.g., a named witness), counsel need not produce all available evidence within that category if the evidence presented fulfills the promise in the eyes of the jury. *See McAleese v. Mazurkiewicz*, 1 F.3d 159, 167 (3d Cir.1993) (holding that, despite making promises of alibi witnesses, the defense was not required to call a particular witness in addition to others who gave relevant testimony).[11] Indeed, the First Circuit, the same court that decided *Anderson*, follows this rule. In *Yeboah–Sefah v. Ficco*, 556 F.3d 53 (1st Cir.2009), *cert. denied*, — U.S. —, 130 S.Ct. 639, 175 L.Ed.2d 491 (2009), counsel told the jury in his opening statement that " '[p]sychologists and psychiatrists [would] talk about the medical [e]ffects of [the defendant's] medication' upon him, and

---

10. Even then, if there was something to be gained strategically by making the promise, despite intending or reasonably expecting not to deliver on it, counsel's performance may be considered effective. *See Commonwealth v. McMahon*, 443 Mass. 409, 822 N.E.2d 699, 713 (2005) (stating that because "the strategic benefit of announcing specific anticipated testimony in the opening statement may outweigh the risk that the testimony will not be available," failing to present that evidence may be justified if doing so is the result of a clear "strategic choice[] made after thorough investigation" (internal quotation marks omitted)).

11. However, promising a category of evidence may constitute ineffective assistance where no evidence within that category is presented. *See, e.g., United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257–58 (7th Cir.2003) (unfulfilled promise to produce evidence that the defendant was not a gang member); *State v. Zaborski*, 59 N.Y.2d 863, 465 N.Y.S.2d 927, 452 N.E.2d 1255, 1256–57 (1983) (mem.) (unfulfilled promise to produce entrapment evidence); *Commonwealth v. Lambeth*, 273 Pa.Super. 460, 417 A.2d 739, 740 (1979) (per curiam) (unfulfilled promise to produce evidence that the defendant and the victim had argued and that the victim had threatened the defendant).

that the jury would 'hear testimony by experts' during the course of [the] trial assessing [the defendant's] capacity." *Id.* at 77 (first and fifth alterations in original) (additional alteration omitted). The prosecution called a psychologist, and the defense called a psychiatrist. *See id.* at 76. However, the defense's psychiatrist could testify only as to defendant's mental state with respect to one of his charges, while a psychologist not called by the defense could have testified with respect to the second charge. *See id.* The defendant appealed, claiming that his trial counsel was ineffective for failing to call the psychologist based on the promise made in the opening statement. *See id.* at 64. The First Circuit rejected that argument, holding that "the statement did not contain an explicit promise that the defense would call both psychiatrists and psychologists to the stand, let alone a specific promise to call [a particular psychologist]." *Id.* at 77 (emphasis omitted). Therefore, the *Yeboah–Sefah* court concluded that "the only actual 'promises' made by counsel therein were not in fact broken." *Id.*

¶ 30 The opening statement made by Walker's counsel promised only a category of evidence, not specific evidence. That promise was not left unfulfilled. In the opening statement, counsel discussed Walker's PTSD and told the jury, "At the end of this evidence, if you give it the attention that it deserves, you'll find that [Walker] was—that he was suicidal, not homicidal, and he's not a monster, he's mentally ill." Counsel did not promise that Dr. Gregory, or any expert for that matter, would testify, only that the evidence, if considered carefully, would show Walker was suicidal and mentally ill. During trial, the jury did hear evidence that Walker was suicidal and that he suffered from PTSD. Thus, as in *Yeboah–Sefah*, the promise made to the jury was not broken. We hold, therefore, that counsel's decision not to call Dr. Gregory was not deficient.

**D. Even If Defense Counsel's Performance Was Deficient, the Failure to Call Dr. Gregory Was Not Prejudicial.**

¶ 31 To prevail on an ineffective assistance of counsel claim, the defendant must show, in addition to deficient performance by counsel, that counsel's substandard performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. Thus, Walker was required to show that "a reasonable probability exists that but for the deficient conduct [he] would have obtained a more favorable outcome at trial." *Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. We agree with the State that Walker cannot meet this burden.

¶ 32 Despite the lack of expert testimony, the jury was apprised of Walker's PTSD and the comments Walker made on the day of the crime about feeding Vietnamese children. One of the officers at the scene of the crime testified that Walker stated he was a veteran and provided his name, rank, and branch of service. Furthermore, the jury was informed that Walker was completely disabled due to his condition, was involved in a disabled veterans group, and was receiving regular medication from the VA hospital. Walker's friend also provided evidence concerning Walker's mental health, stating that Walker did not talk about his military service "because one of the things you try to do when you got PTSD is ... go out of your way not to talk about it." In light of this evidence, we are not persuaded that Walker was prejudiced by the absence of Dr. Gregory's testimony.

¶ 33 Furthermore, the additional PTSD evidence Dr. Gregory would have provided would not have supported Walker's imperfect self-defense, extreme emotional distress, and voluntary intoxication defenses, as none of those defenses relate to mental illness. In fact, as previously discussed, Dr. Gregory's testimony may have undermined these defenses. In addition, the State was prepared to rebut Dr. Gregory's testimony with its own expert who also intended to challenge Walker's military service and highlight other weaknesses in his mental illness defense. Furthermore, defense counsel did not request that a mental health defense instruction be submitted to the jury. Therefore, additional PTSD evidence could not have contributed to a more favorable outcome for Walker.

¶ 34 Finally, the State presented physical evidence that Cassandra was shot thirteen or fourteen times and that Walker came closer and fired a final shot into her head after she had fallen. Given this evidence, it is unlikely that Dr. Gregory's testimony would have been sufficient to contradict the State's theory that Walker acted consciously and intentionally.

¶ 35 Considering the record here, we cannot conclude that the introduction of Dr. Gregory's testimony would result in a reasonable probability of a more favorable outcome. We therefore reject Walker's claim that he received ineffective assistance of counsel based on the decision not to call Dr. Gregory.

## II. Failure to File a Motion to Suppress Walker's Statements Made During the Interrogation

¶ 36 Walker also argues that his counsel was ineffective for not moving to suppress statements made by Walker in his police interview on the ground that the *Miranda* warnings were inadequate. While the State concedes that Walker received inadequate *Miranda* warnings, it nevertheless maintains that counsel's decision not to have the interview suppressed was tactical and did not constitute ineffective assistance. The State further argues that Walker was not prejudiced by its use of his statement, "I don't want her leaving me."

### A. The Failure to Seek Suppression of the Police Interview Transcript Was Deficient.

¶ 37 Whether counsel is ineffective must be determined "in light of all the circumstances," *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and "the failure to file a suppression motion does not constitute per se ineffective assistance of counsel," *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (emphasis omitted). However, in this case, we cannot conceive of any reasonable tactical justification for failing to file a motion to suppress the police interview.

¶ 38 The State argues that the interview supports Walker's defenses of voluntary intoxication and extreme emotional distress. Thus, the State contends that it was reasonable for defense counsel to conclude that the benefit derived from using the interview outweighed the potentially damaging use of the statement, "I don't want her leaving me." While defense counsel did use the interview for these purposes, other witnesses similarly testified that Walker was obviously intoxicated and that he was emotionally unstable. The two friends who came to Walker's aid on the night of Cassandra's death testified that he was intoxicated and that he had threatened to kill himself. The officers and police department staff who came in contact with Walker that night also testified that he was intoxicated and disoriented. Furthermore, the most compelling evidence of Walker's level of intoxication may have been the video of the interview itself, which was never played for the jury.

¶ 39 Under these circumstances, the benefit of the police interview was marginal, at best, and does not support any reasonable trial strategy to allow the statements made during the interview to be admitted without challenge. We agree with Walker that the failure to file a motion to suppress was deficient.[12]

### B. The Admission of the Statements From the Interview Was Not Prejudicial.

¶ 40 As discussed in connection with the previous issue, Walker must also demonstrate that "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt" to prevail on an ineffective assistance of counsel claim, *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. We agree with the State that this second prong is not satisfied here. Walker's statement, "I don't want her leaving me," was referred to three times in the

---

12. Walker also claims that defense counsel did not make a reasonable investigation because they never viewed the video of the interview, relying instead only on the written transcript. We can find no record support for this assertion, and we reject Walker's invitation to assume that this is true.

course of the three-day trial: in the prosecution's opening statement, in the direct examination of the detective, and in the prosecution's closing statement.

¶ 41 However, there was significant additional evidence of Walker's motive and Cassandra's intent to leave: Walker and Cassandra had been arguing throughout the day; she told several people that she intended to leave him; she had removed her wedding ring; she actually did leave him that afternoon; she apparently returned in the evening only to retrieve her wallet; and at the time of her death, Cassandra's car was packed with clothing and toiletries. Considering all of the evidence presented to the jury, the admission of the disputed statement does not "undermine [our] confidence in the outcome," *see id.* at 694, 104 S.Ct. 2052.[13]

### CONCLUSION

¶ 42 It was a reasonable strategic decision not to call Dr. Gregory as a witness. Moreover, the identification of Dr. Gregory as a potential witness for the defense did not require the defense to offer her testimony at trial. To the extent that defense counsel's opening statement could be construed as a promise of evidence of a particular topic, we cannot say that the promise was not fulfilled. Additionally, although counsel should have filed a motion to suppress the police interview, the failure to do so did not prejudice Walker.

¶ 43 Affirmed.

¶ 44 WE CONCUR: WILLIAM A. THORNE JR., and STEPHEN L. ROTH, Judges.

---

13. For the same reason, we reject Walker's argument that defense counsel was ineffective for permitting the prosecution to rely on the transcript of his police interview, despite his contention that the statement transcribed as "I don't want her leaving me" was actually inaudible in the video recording of the interview.